METHODIST HOSPITAL OF
SACRAMENTO, et al.,
Appellants,

v.

Donna E. SHALALA, Secretary of Health
and Human Services, Appellee.

No. 93–5148.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 13, 1994.

Decided Nov. 25, 1994.

Cary M. Adams argued the cause and filed the briefs, Sacramento, CA, for appellants.

John P. Schnitker, Atty., U.S. Dept. of Justice, argued the cause, Washington, DC, for appellee. With him on the brief were Frank W. Hunger, Asst. Atty. Gen., Eric H. Holder, Jr., U.S. Atty., Anthony J. Steinmeyer, Atty., U.S. Dept. of Justice, Washington, DC, and Lawrence J. Harder, Baltimore, MD, and Gerard Keating, Counsel, U.S. Dept. of Health and Human Services, Washington, DC.

Before SILBERMAN, SENTELLE, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

This appeal challenges a policy that denies retroactive effect to a revised wage index used in determining Medicare reimbursement rates under the Prospective Payment System. In August 1984, the Secretary of Health and Human Services corrected an erroneous regional wage index for the Sacramento area, but refused to apply the new index retroactively to January 1984. Appellants, a group of eight non-profit hospitals affected by the erroneous index, unsuccessfully challenged this policy in the district court. On appeal, the hospitals contend that (1) the Medicare statute requires the Secretary to give retroactive effect to wage index corrections; (2) the Secretary's policy is arbitrary and capricious because it is inconsistent with the regulatory history and produces absurd results; and (3) the policy is invalid for lack of adequate notice and comment under the Administrative Procedures Act. Consistent with our deferential standard of review, we conclude that the Secretary's choice was permissible. We also conclude that the policy is not procedurally invalid. Accordingly, we affirm.

## I.

**A. *Statutory Framework.*** The Medicare program, established in 1965, provides federally funded health insurance for the el-

derly and disabled. *See* Title XVIII of the Social Security Act, 79 Stat. 291, *as amended*, 42 U.S.C. § 1395 *et seq.* (1988). Under an extremely "complex statutory and regulatory regime," *Good Samaritan Hospital v. Shalala,* —— U.S. ——, ——, 113 S.Ct. 2151, 2154, 124 L.Ed.2d 368 (1993), health care providers are reimbursed for certain costs that they incur in treating Medicare beneficiaries. Prior to October 1983, Medicare reimbursements were based on the "reasonable costs" of inpatient services furnished to Medicare patients. 42 U.S.C. § 1395f(b) (1988). Under this regime, providers were reimbursed for the actual costs that they incurred, provided they fell within certain cost limits.[1] Thus, as hospital costs increased, so too did Medicare reimbursements.

Concerned about escalating Medicare expenditures, Congress in 1983 completely revised the scheme for reimbursing Medicare hospitals. *See* Social Security Amendments of 1983, Pub.L. No. 98–21, § 601, 97 Stat. 65, 149 ("1983 Amendments"). The new regime, known as the Prospective Payment System ("PPS"), relies on prospectively fixed rates for each category of treatment rendered. In contrast to hospital reimbursements under the reasonable-cost method, PPS rates do not vary in individual cases. Hospitals instead receive advance notice of the rates at which their services will be reimbursed, regardless of costs actually incurred. Congress designed this system to encourage health care providers to improve efficiency and reduce operating costs. Indeed, this link between prospectivity and efficiency lay at the heart of Congress' purpose when it created the PPS system:

> The bill is intended to improve the medicare program's ability to act as a prudent purchaser of services, and to provide predictibility [*sic*] regarding payment amounts for both the Government and hospitals. More important, it is intended to reform the financial incentives hospitals face, promoting efficiency in the provision of services by rewarding cost/effective hospital practices.

H.Rep. No. 25, 98th Cong., 1st Sess. 1, 132 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 351 ("House Report"); *see also* S.Rep. No. 23, 98th Cong., 1st Sess. 1, 53 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 193 ("Senate Report") ("[PPS amendments] are intended to create incentives for hospitals to operate in a more efficient manner, since hospitals would be allowed to keep payment amounts in excess of their costs and would be required to absorb any costs in excess of the DRG rates.").

Under PPS, Medicare authorities first construct a standard nationwide cost rate—the "federal rate"—based on the average operating costs of inpatient hospital services. *See* 49 Fed.Reg. 234, 251 (Jan. 3, 1984). They then assign a weight to each category of inpatient treatment, or "diagnosis-related group" ("DRG"). Finally, they calculate a "wage index" to adjust reimbursement rates to reflect regional variations in hospital wage costs. For each patient discharge, a hospital's final reimbursement is calculated by taking the federal rate, adjusting it for wage variations, and multiplying it by the weight assigned to the patient's DRG. *See generally* 42 U.S.C. § 1395ww(d)(2) (1988).

The wage index reflects a requirement in the 1983 Amendments that the federal rate be adjusted to reflect geographic variations in labor costs.[2] *See* 42 U.S.C. § 1395ww(d)(2)(H). The area wage indexes for each region are based on wage-cost data periodically submitted by Medicare hospitals across the country. The indexes are used at two points in the prospective payment rate calculation. First, regional wage indexes are used (along with other factors, such as inflation and hospital case-mix ratios) to modify and standardize the data used to establish the nationwide "federal rate." *See* 42 U.S.C. § 1395ww(d)(2)(C)(ii). Second, once the federal rate has been set, the wage indexes are

---

1. In 1972, in an early effort to contain Medicare costs, Congress authorized the Secretary to establish cost limits, beyond which hospitals would generally not be reimbursed. *See* 42 U.S.C. § 1395x(v)(1)(A) (1988).

2. The Secretary employed a similar wage index under the previous reasonable cost reimbursement regime. Beginning in 1979, a wage index was used to make regional adjustments to standard cost limits. *See* 42 CFR § 413.30 (1993).

used to make regional adjustments to the labor-related portion of the federal rate. *See* 42 U.S.C. § 1395ww(d)(2)(H). Because each wage index is used to develop the base national rate as well as to adjust that rate by region, a change in any single wage index can affect the reimbursement rate of each hospital in the country.

Recognizing that PPS dramatically changed the financing of the country's health-care delivery system, Congress provided a transition period in order "to minimize disruption that might otherwise occur because of sudden changes in reimbursement levels." Senate Report at 53, 1983 U.S.C.C.A.N. at 193. During the four-year transition period, an increasing proportion (25 percent each year) of the final reimbursement rate was based on the standardized "federal rate," while a decreasing proportion was based on the previous reasonable cost regime.[3] Thus, at the end of the transition period, reimbursement is based solely on the federal rate. 42 U.S.C. § 1395ww(d)(1)(A)(iii). This appeal concerns the calculation of the *federal rate* component, based on the new PPS system, during the first transition year.

**B. *History of Proceedings.*** The error that led to this appeal occurred prior to the creation of the PPS system. A large Sacramento-area hospital (not a party to this appeal) supplied inaccurate 1981 wage data to the California state authorities. (The hospital provided accurate total wage and employee data, but submitted an incorrect "estimate" of the salary allocation between educational and hospital employees.) The state sent the data to the federal Bureau of Labor Statistics ("BLS"). The BLS provided the Secretary with the wage and employment data that was eventually used to construct the wage indexes published on September 1, 1983, applicable during the first (transition) year of PPS. As a result, the Sacramento wage index understated the actual labor costs faced by Sacramento hospitals relative to the national average in 1984.

The other Sacramento hospitals recognized the error upon publication of the index, which showed a drop in the Sacramento index compared to previous years. After investigation revealed the source of the incorrect data, the hospitals persuaded the errant provider to submit corrected wage data. The state and the BLS processed the new data and transmitted it to the Secretary, who recalculated the Sacramento wage index and issued a corrected index on August 10, 1984.[4] Nevertheless, because the wage index published in September 1983 remained in effect from January 1, 1984, through August 10, 1984, appellant-hospitals lost $730,600 in Medicare reimbursements that they otherwise would have received had the correct salary data been originally submitted.

When the hospitals sought to recover their losses after discovering the error, the Secretary's intermediaries refused to apply the recalculated wage index retroactively. The hospitals successfully appealed to the Provider Reimbursement Review Board (the "Board"). A Board majority ruled that this court's decision in *Georgetown Univ. Hosp. v. Bowen,* 862 F.2d 323 (D.C.Cir.1988) (*Georgetown II* ), combined with the need to correct errors to make disadvantaged parties whole, required the Secretary to apply wage index corrections retroactively.

Acting on behalf of the Secretary, the Health Care Financing Administration ("HCFA") reversed the Board. The HCFA Deputy Administrator concluded that the PPS regime depends on prospectivity, and that retroactive corrections would undermine

---

**3.** The latter component of the transition formula is known as the "hospital-specific" rate, and was designed to reflect a hospital's historic costs. The hospital-specific rate was based upon a hospital's "allowable operating costs" during a base year, as calculated under the prior system, with several adjustments relevant to the PPS amendments. *See* 42 U.S.C. § 1395ww(b)(3)(A) (1988); *see also Georgetown Univ. Hosp. v. Bowen,* 862 F.2d 323, 324 (D.C.Cir.1988) (*Georgetown II* ). During the transition period, a hospital's "blend-ed payment rate" therefore consisted of the hospital-specific rate added to the federal rate.

**4.** According to the Provider Reimbursement Review Board, the corrected wage data was submitted to the State of California on April 13, 1984, and the state sent it to BLS after July 10, 1984. The Secretary published a revised wage index on August 10, 1984, changing 60 of the 314 previously published wage indexes for urban areas.

the statutory purpose to base Medicare reimbursements on predetermined rates. The hospitals then sought review of the Deputy Administrator's decision in federal district court.[5] *See* 42 U.S.C. § 1395oo(f)(1) (1988). On cross-motions for summary judgment, the district court upheld the HCFA Administrator's decision. The district court concluded that because Congress had not explicitly addressed how errors were to be corrected, the Secretary's prospective-corrections policy reasonably furthered the goals of the PPS system and reduced the administrative burden on the agency, albeit at the occasional expense of accuracy.[6] The hospitals appeal.

## II.

The hospitals present three principal challenges to the Secretary's prospective-only policy toward error corrections. They contend that: (1) the policy is inconsistent with the Medicare statute and subsequent legislative and regulatory action; (2) the policy is not rational because it provides no incentives for accurate reporting and could yield absurd results, while a policy of retroactive correction would present no jeopardy to the prospective nature of PPS; and (3) the policy is invalid for failure to comply with the notice and comment provisions of the Administrative Procedure Act ("APA").

■ **A.** *Standard of Review.* In reviewing the agency's final action, *see supra* note 5, the court addresses the issue *de novo*, without deference to the decision of the district court. *See HCA Health Serv. of Okla., Inc. v. Shalala,* 27 F.3d 614, 616 (1994) (D.C.Cir.1994). The court therefore will set aside the agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see* 42 U.S.C. § 1395oo(f)(1). In examining the Secretary's interpretation of a statute that she administers, the court applies the familiar methodol-

ogy of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The court first determines whether Congress has "directly spoken to the precise question at issue." 467 U.S. at 842, 104 S.Ct. at 2781 ("If the intent of Congress is clear, that is the end of the matter...."). If it has not, then the court must defer to the Secretary's "permissible construction" of the statute. *Id.* at 842–43, 105 S.Ct. at 2781–82.

Furthermore, in framing the scope of review, the court takes special note of the tremendous complexity of the Medicare statute. That complexity adds to the deference which is due to the Secretary's decision. The Supreme Court has made clear that courts must give heightened deference to the Secretary's interpretation of a "complex and highly technical regulatory program" such as Medicare. *Thomas Jefferson Univ. v. Shalala,* — U.S. ——, ——, 114 S.Ct. 2381, 2387, 129 L.Ed.2d 405 (1994) (citations omitted); *cf. Schweiker v. Gray Panthers,* 453 U.S. 34, 43, 101 S.Ct. 2633, 2639–40, 69 L.Ed.2d 460 (1981) ("The Social Security Act is among the most intricate ever drafted by Congress.").

■ **B.** *Statutory Language and Congressional Intent.* The hospitals contend that the 1983 Amendments, together with certain subsequent legislative enactments, reveal Congress' intent to favor the retroactive application of wage index corrections. Nevertheless, they fail to demonstrate that Congress spoke to the "precise question at issue," namely, whether subsequently discovered errors in the area wage indexes must be corrected retroactively. *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781.

The relevant provision in the 1983 Amendments requires that after calculating the standard DRG prospective payment rates:

> [t]he Secretary shall adjust the [wage-related portion of the federal rates] for area differences in hospital wage levels by a

---

5. The Deputy Administrator's decision constitutes the final agency action in this case. *See St. Mary of Nazareth Hosp. v. Schweiker,* 718 F.2d 459, 466 (D.C.Cir.1983); *Sun Towers Inc. v. Heckler,* 725 F.2d 315, 326 (5th Cir.), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).

6. Although the district court initially ruled that the Secretary's policy was nonetheless invalid for failure to meet the notice and comment requirements of the APA, the court subsequently rejected the procedural challenge in response to cross-motions to amend or alter the judgment.

factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level.

42 U.S.C. § 1395ww(d)(2)(h). According to the hospitals, this section must be read to require the retroactive application of all corrections to erroneous wage data. They contend that the mandatory language ("The Secretary *shall adjust*") necessarily implies a retroactive component. Otherwise, they argue, the Secretary would be employing an "incorrect" wage index until the correction became effective, thus violating the statute's mandate that the DRG rates reflect different wage costs in different regions. We disagree.

The parties do not dispute that the wage index published in September 1983 made use of the most reliable data available to the Secretary at the time of publication. *See* 48 Fed.Reg. 39,752, 39,765 (Sept. 1, 1983). Because the index is based on available wage data from past years, at any given time the wage index must reflect the Secretary's best approximation of relative regional wage variations. But the hospitals' reading of the statute, taken literally, would not permit such reasonable approximations. Rather, their argument would require the Secretary to make virtually continuous adjustments in the wage index in order to incorporate changing regional wage levels. Such a scheme is not suggested in the 1983 Amendments, which merely requires the Secretary to develop a mechanism to remove the effects of local wage differences. The statute does not specify how the Secretary should construct the index, nor how often she must revise it, although these methodological issues both bear significantly on the accuracy of the Secretary's adjustments. Rather, Congress through its silence delegated these decisions to the Secretary.

■ The hospitals nonetheless contend that the statute's administrative and judicial review procedures indicate that Congress intended wage index corrections to apply retro-

actively. With two exceptions not relevant to this appeal, Congress carried over to the PPS the same procedures for judicial review that applied under the previous cost-based regime.[7] According to the hospitals, Congress retained these procedures in the expectation that administrative and judicial decisions would have the same retroactive effect as they did under the previous "reasonable cost" system. Moreover, the hospitals maintain that "the right to appeal necessarily assumes the right to have corrections implemented retroactively." This position is untenable.

First, Congress' decision to retain certain appellate review procedures from a prior reimbursement regime does not necessarily imply congressional intent to maintain identical *remedies*. In PPS, Congress created "a radically new method for determining Medicare reimbursement," *Georgetown II*, 862 F.2d at 329, as well as a new method for handling reimbursement payments. *See Washington Hosp. Center v. Bowen*, 795 F.2d 139, 146 (D.C.Cir.1986). Here, the Secretary decided to alter the retroactive effect of appellate proceedings, a decision that Congress left open in the 1983 Amendments. This choice does not limit the availability of judicial or administrative review itself.

Second, contrary to the hospitals' assertion, the availability of appeal does not necessarily imply the availability of retroactive remedies. Administrative proceedings and judicial review could still provide a meaningful corrective remedy if, for example, the Secretary refused to make any revision to an erroneous wage index. The hospitals contend that non-retroactive relief would in practice be meaningless because "an appeal cannot generally be initiated ... until a cost report is filed and audited for a fiscal period that has ended, and the intermediary has issued its Notice of Program Reimbursement...." But the hospitals cite no authority—in the statute, regulations, or case law—to support this proposition, and we find it unpersuasive. *Cf. Washington Hosp. Center v. Bowen*, 795 F.2d at 146 ("[T]he appeals

---

7. *See* 42 U.S.C. § 1395ww(d)(7); House Report at 142–43, 1983 U.S.C.C.A.N. at 361–62 (stating that "the same procedures for administrative and judicial review of payments under [the PPS] [will be available] as [are] currently provided for cost-based payments").

provision applicable to PPS recipients cannot be read to require hospitals to file cost reports and await NPRs prior to filing a PRRB appeal.").

■ As a final element in their congressional intent argument, appellants rely on two subsequent legislative enactments in which Congress appeared to endorse retroactive wage index corrections. In the first, Congress directed the Secretary to develop an improved wage index that would account for wage differences between full- and part-time workers, and for those indexes that would change under the new methodology, to make retroactive adjustments to amounts paid under the previous indexes. *See* Deficit Reduction Act of 1984 ("DEFRA"), Pub.L. No. 98–369, § 2316(a)–(b), 98 Stat. 494, 1081.[8] In 1989, Congress passed a second statute that required the Secretary to give retroactive effect to certain wage index errors. *See* Omnibus Budget Reconciliation Act of 1989 ("OBRA"), Pub.L. No. 101–239, § 6003(h)(5), 103 Stat. 2106, 2157 (1989). OBRA is not directly applicable to the wage index at issue in this appeal because its reach was limited to erroneous wage data submitted in response to the Secretary's 1984 wage survey; this appeal involves 1981 wage data submitted to the BLS.

Although Congress revoked the retroactivity provision in the first statute and limited its application in the second statute to a year not relevant here, the hospitals maintain that the retroactivity provisions in both DEFRA and OBRA indicate that Congress saw no inconsistency between the purposes underlying the PPS scheme and retroactive error correction. While this may be true, it does not demonstrate the congressional intent that is critical to the hospitals' position. As the Supreme Court has pointed out, " 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' " *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2619, 120

L.Ed.2d 407 (1992) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331–32, 4 L.Ed.2d 334 (1960)). The most relevant congressional intent for purposes of *Chevron* step one analysis is the intent at the time Congress passed the original PPS statute, and Congress did not address the retroactivity question in the 1983 Amendments. Indeed, the specific retroactivity language in later statutes highlights the absence of such language in the original PPS statute.

Finally, notwithstanding the hospitals' suggestion, our conclusion that the statute's wage adjustment provision does not require retroactive corrections is not in conflict with the holding in *Georgetown II.* In that case, the court invalidated a policy that gave only prospective effect to changes in "allowable costs" under the "hospital-specific" portion of the PPS transition rate. *See supra* note 3. Examining the statute's language and legislative history, the court identified a clear congressional intent to provide retroactive adjustments to "allowable costs" because the hospital-specific provision retained and incorporated the previous reasonable-cost regime into the PPS rate during the transition period. 862 F.2d at 326–27 & n. 9. Because *Georgetown II* focused only on the *hospital-specific* portion of the PPS transition rate, its reasoning does not extend to the instant appeal.[9] Indeed, the *Georgetown II* court expressly recognized the distinction between the analysis of provisions under the hospital-specific component and those under PPS:

> [W]e note that when the PPS statute instructs the Secretary to determine "allowable operating costs per discharge" under the *new* prospective payment methodology, *see* 42 U.S.C. § 1395ww(d)(2)(A), it invokes an entirely different sense of the term: costs that are allowable under the new system may *not* be subject to subsequent retrospective revision, but that certainly does not mean that the same must be true

---

8. DEFRA's retroactivity provision was never implemented due to the subsequent passage of legislation which functionally revoked § 2316(b) by making any revisions to the wage index arising under DEFRA effective only "for discharges occurring on or after May 1, 1986." *See* Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Pub.L. No. 99–272, § 9103(a)(1)–(2), 100 Stat. 82, 156.

9. For the same reason, the hospitals' reliance on *Corpus Christi Osteopathic Hosp. v. Blue Cross & Blue Shield of Texas,* 1989–1 Medicare & Medicaid Guide (CCH) ¶ 37,672 (1989), is misplaced.

when the statute refers to costs that were "allowable" under an entirely different payment methodology.

*Georgetown II,* 862 F.2d at 327 n. 11. Here, where the court must focus on procedures to implement the "entirely different payment methodology" of PPS, *id.,* the hospitals have pointed to no comparable intent on the part of Congress.

■ *C. Reasonableness of the Policy.* We therefore turn to the hospitals' contention that even if Congress was silent on the question of retroactive wage-index revisions, the Secretary's policy of prospectivity was arbitrary and capricious. In evaluating the policy, the court looks first at whether the Secretary has provided a reasonable rationale for her policy choice. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). In the preamble to the final PPS rules, the Secretary explained the prospective-policy decision as follows:

> We considered retroactively adjusting the prospective payment rates for corrections in the wage index. However, for a number of reasons we did not adopt this approach. Application of a retroactive adjustment to the rates would erode the basis of the prospective payment system that payment will be made at a predetermined, specified rate. We also believe hospitals will have less incentive to report accurate ES 202 data if we guarantee a retroactive correction to the wage index.

49 Fed.Reg. at 258.

The hospitals challenge the Secretary's assertion that a retroactive correction policy would "erode" the prospectivity that lies at the heart of PPS. They point to *Georgetown II,* where the Secretary unsuccessfully argued that retroactive adjustments would undermine the incentives at the heart of the prospective system because hospitals would no longer know with certainty what their prospective payment rates will be. The court dismissed that position and observed that:

> [T]he real linchpin of the [PPS] system may not be that the exact reimbursement *figure* is known in advance, but rather may

be that the hospital knows that nothing it does in providing services will lead to a higher reimbursement level.... The incentives faced by hospitals to keep costs down under PPS should therefore remain unaffected by the government's willingness to make the [retroactive] adjustments at issue here: so long as payments are not tied to hospitals' behavior while PPS is in effect, the government sends no message that profligacy will result in larger payments.

*Georgetown II,* 862 F.2d at 330.

Following *Georgetown II,* we agree that retroactive corrections to inaccurate wage data are not necessarily inconsistent with the PPS system. Yet this agreement does not establish that a prospective-only policy is unreasonable. Indeed, the hospitals fail to demonstrate that the purpose of the PPS system could not reasonably tolerate either a prospective or retroactive correction policy. While retroactive adjustments might leave the "linchpin" of PPS intact, that does not mean that a prospective-only policy would not further, to some degree, the overall goals of PPS. A hospital does not know in advance the total reimbursement that it will receive in a forthcoming fiscal year, due to inevitable variations in its case-mix and case-load. But hospitals, like other businesses, do make projections about future costs and service levels based on their experience and historical patterns. To the extent that the Secretary's prospectivity policy permits hospitals to rely with certainty on one additional element in the PPS calculation rate—the wage index value—the Secretary could reasonably conclude that it will promote efficient and realistic cost-saving targets.

The Secretary refers to this as the "finality" rationale, and we cannot conclude under our deferential standard of review that it is arbitrary and capricious. In addition to promoting efficiency, the Secretary's emphasis on finality protects Medicare providers as well as the Secretary from unexpected shifts in basic reimbursement rates. Although in the instant case the hospitals would benefit from a retroactive correction, Medicare providers might just as likely face adverse consequences from a retroactivity policy where

corrections would reduce the reimbursement rates.[10] The prospective-only policy binds the Secretary as well as the providers, as counsel for the Secretary acknowledged at oral argument. As the Secretary expressly stated in adopting the prospective only policy: "[S]ince a correction to the wage index could decrease as well as increase a hospital's prospective payment rate, we believe we should maintain the prospectivity of the system when making any revisions to the payment rates." 49 Fed.Reg. at 259. The hospitals' claim that the Secretary's policy is not rational thus fails to the extent that a prospective-only policy preserves the expectations of all parties in the PPS system and facilitates the economic incentives that Congress intended. See House Report at 132, 1983 U.S.C.C.A.N. at 351 (referring to Congress' coordinate policies of predictability and finality in prospective reimbursements).

Moreover, the Secretary's rationale is not limited to invoking the sanctity of "prospectivity" for its own sake. The Secretary also points to the concrete purpose of avoiding the administrative burden that a retroactive correction policy would entail.[11] Because each regional wage index is a component of the national wage index, which is used to determine the base federal payment rate, a change in a single wage index could affect the payment rates applicable for each hospital discharge under PPS that year. Under these circumstances, retroactive corrections would cause a significant, if not debilitating, disruption to the Secretary's administration of the already-complex Medicare program. Even if she limits this disruption by choosing not to recalculate the federal rate when she adjusts an individual area wage index,[12] the Secretary might still face a significant burden merely in responding to error corrections for each regional wage index. See supra note 10. We therefore agree with the district court that, based on the arguments advanced by the hospitals, "[i]t was not arbitrary and capricious of the Secretary to decide that the administrative burden of recalculating the reimbursement rate for every hospital in a metropolitan area every time any hospital in that area makes an error in reporting wage data outweighs the increase in accuracy that would result."

Finally, the Secretary defends the prospective-only policy on the grounds that it will create incentives for accurate reporting. According to the Secretary, a policy that denies retroactive corrections will encourage hospitals to submit carefully prepared data in the first instance because they know that a subsequent correction will have only prospective effect. We agree. The origin of the instant case strongly suggests that the Secretary's concerns about accurate reporting are justified, and that the lack of retroactive corrections will induce more exacting practices. Given the serious fiscal repercussions at stake, it is inconceivable that, as the hospitals suggested to the Secretary had inadvertently occurred here, a hospital in the future would submit data based on guesses about the allocation of their employees' reimbursable salaries.

The hospitals respond that Medicare providers already have sufficient incentives to report accurate data, including penalties for tax and Medicare fraud. They also note that the wage index in the instant case was derived from data submitted to a state agency

10. On the same day that the Secretary published Sacramento's corrected wage index, for example, the Secretary also issued revisions for 59 other regions. Of the 60 corrections released that day, 32 (including Sacramento) involved increases to the wage index, while 28 indexes were decreased. The amounts for several regions were lowered by a degree comparable to the increase in Sacramento's index.

11. We are unpersuaded by the hospitals' argument that this "administrative burden" argument constitutes an impermissible post hoc rationalization by counsel. While the Secretary could have placed a finer point on this issue in announcing her rationale, we accept her position that the concerns about administrative burden were encompassed in the general claim that retroactivity would "erode" the PPS system. See 49 Fed.Reg. at 258. In any event, our conclusion in this appeal is not based solely on the administrative burden rationale.

12. In the final PPS rule, the Secretary adopted such an approach toward prospective corrections. See 49 Fed.Reg. at 258 ("[A]ny revisions in wage indexes will only apply to the area wage adjustment to the standardized amounts. We will not recalculate the standardized amounts themselves based on revised wage indexes.").

for payroll tax purposes; in their view, the risk that overreporting will lead to higher payroll taxes effectively counterbalances any incentives to report inflated wage data. Finally, the hospitals argue that the prospective-only policy might actually encourage those providers tempted to overestimate costs because providers would benefit from their fraudulent submissions until the errors could eventually be corrected.

But the hospitals miss the point of the Secretary's argument. It may well be true that Medicare fraud provisions establish effective disincentives against purposeful misreporting, and that a hospital might actually be encouraged by the prospective-only policy to misreport. Yet the Secretary's rationale need not be justified only by reference to its impact on those providers engaging in intentional fraud. The shortsightedness of those hospitals is patent. And regardless of the response of ill-intentioned providers, the Secretary can still reasonably determine that a prospective-only policy will encourage most hospital administrators to implement Medicare-specific reporting procedures designed to improve wage-index accuracy. Indeed, record testimony indicated that Medicare providers generally did not coordinate their wage data and Medicare reporting obligations at the time the instant case arose. Because the Secretary must rely on wage information submitted by others, her interest in the integrity and accuracy of such data is undeniable. The hospitals thus fail to show that the Secretary's accurate reporting rationale is unreasonable.

The hospitals' contention that the Secretary has inconsistently applied the prospective-only policy fares no better. They first rely on the Secretary's decision in *Corpus Christi Osteopathic Hosp. v. Blue Cross & Blue Shield of Texas*, 1989–1 Medicare & Medicaid Guide (CCH) ¶ 37,672 (1989) ("*Corpus Christi*"). That case involved an over-

payment to a Medicare hospital caused by an intermediary's misreading of the provider's case-mix index as published in the *Federal Register*. (The case-mix index is used to calculate the hospital-specific component during the PPS transition period.) The HCFA Deputy Administrator concluded that the Secretary could retroactively correct the error and recoup overpayments dating back to year one of the PPS transition. Citing *Georgetown II*, the Deputy Administer stated that "PPS is not a rigidly prospective system and ... retrospective adjustments should be made when payment rates were initially calculated on the basis of erroneous information." *Id.* at p. 19,630.

*Corpus Christi*, like *Georgetown II*, supports the hospitals' position that retroactive corrections are not necessarily inconsistent with the PPS system. But that consistency does not by itself make the Secretary's policy unreasonable, and the Secretary's position in *Corpus Christi* is not inconsistent with the Secretary's position in this appeal. As in *Georgetown II*, *Corpus Christi* concerned the calculation of the hospital-specific rate during the PPS transition period. *See supra* note 9. Although the Deputy Administrator's language favoring retroactivity in *Corpus Christi* can be read broadly, so can the Secretary draw reasonable distinctions between hospital-specific policies and those concerning the forward-looking PPS.

The hospitals also point to four occasions in which they claim the Secretary has made retroactive adjustments to area wage indexes. While the hospitals apparently seek to portray these revisions as inconsistent agency actions that make the policy under review arbitrary and capricious, the Secretary has adequately demonstrated that no retroactive application actually occurred in these cases.[13] In none of these cases did the Secretary's action change the date of effectiveness of the

---

13. In three of the cited examples, the Secretary published revisions to previously published wage indexes; in each case, the correct figure had been entered into the Medicare computer payment program and applied prospectively from the original date of effectiveness. The published correction served merely to conform the incorrect published figure with the correct figure actually used in calculating hospital reimbursements.

The hospitals were notified of the corrected index value through payment notices issued by Medicare intermediaries. In another instance, the Secretary's published revision never affected actual hospital payments because Congress delayed the implementation of the originally published wage index until a date subsequent to the publication of the revised figure.

correct wage index values. In one instance where retroactive correction did occur—an instance discovered by the Secretary in the course of this litigation—the Secretary has acknowledged that the earlier action was contrary to agency policy.[14]

Finally, the absurd results hypothesized by the hospitals do not, on balance, demonstrate that the Secretary's policy is arbitrary or capricious.[15] As the district court concluded, the Secretary's prospective-only policy was a reasonable choice between the competing values of finality and accuracy. *See Chevron*, 467 U.S. at 865, 104 S.Ct. at 2792–93 (concluding that an agency deserves deference where its policy "represents a reasonable accommodation of manifestly competing interests"). On one hand, the prospective-only policy will on occasion result in a wage index of imperfect accuracy in any given fiscal year. On the other hand, a policy of retroactive corrections would erode the predictability and finality that underlie the PPS scheme. It would also add to the Secretary's burden in administering the vast Medicare system. Confronted with this choice, the Secretary decided as a matter of policy that the interests in finality and administrative efficiency outweighed the value of increased accuracy.

For these reasons we conclude, inasmuch as Congress delegated that choice to the Secretary, that the hospitals have failed to demonstrate that the Secretary's policy choice is impermissible. While her choice was not the only one permissible under the statute, the court has no occasion to second guess the Secretary based on the arguments presented by the hospitals. *Cf. Hennepin*

County v. Sullivan, 883 F.2d 85, 91 (D.C.Cir. 1989) ("[T]here is nothing inherently arbitrary or capricious about an agency's decision to apply new data prospectively only."), *cert. denied*, 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990). Our deference is heightened where, as here, "the agency's current view ... so closely fits the design of the statute as a whole and ... its object and policy." *Good Samaritan Hosp.*, —— U.S. at ——, 113 S.Ct. at 2161 (citing *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 1001–02, 108 L.Ed.2d 132 (1990)).

**D. The Administrative Procedure Act ("APA").** Finally, the hospitals contend that the prospective-only policy is procedurally invalid because it was not adopted in compliance with APA notice and comment requirements. The hospitals contend that interested parties had no meaningful opportunity to comment on the policy or its rationale, and that the new policy represented a material change from the previous policy toward retroactive adjustments under the reasonable-cost regime. The Secretary defends the decision to bypass APA procedures on the grounds that the normal APA requirements did not apply to her adoption of the PPS rules, and that even if they did, the "good cause" exception to notice and comment rulemaking should apply. *See* 5 U.S.C. § 553(b)(B) (1988).

Congress enacted the PPS statute in April 1983.[16] In order to accelerate the Secretary's implementation of the new system, the statute provided an "expedited regulatory process" for the new PPS regulations.[17] Ac-

---

**14.** Since discovering this error during preparations for this litigation in the district court, the Secretary has taken steps to reverse that earlier action. The hospitals point to this correction—a retroactive adjustment justified in the name of prospectivity—as further evidence of the Secretary's unreasonableness. However, the Secretary merely seeks to rectify an acknowledged error in order to maintain consistency and predictability in her administration of the complex Medicare regime. The existence of one inconsistent application does not demonstrate the unreasonableness of an otherwise reasonable policy.

**15.** The hospitals suggest that under the Secretary's prospective-only policy toward wage index corrections, the scope of possible error is unlimited and therefore absurd. They posit a hypo-

thetical case where a zero value is assigned to an area wage index, thus preventing hospitals from receiving any compensation for their labor-related costs until the error could be corrected. Because the wage indexes are calculated by computer, and because each index is merely a variation on an average national labor cost represented by the numeral "1," however, the likelihood of such absurd errors would appear to be exceedingly low.

**16.** *See* Social Security Amendments of 1983, Pub.L. No. 98–21, § 601, 97 Stat. 65, 149 (April 20, 1983).

**17.** House Report at 158, 1983 U.S.C.C.A.N. at 377.

cordingly, § 604(c) of the 1983 Amendments required the Secretary to publish the interim final rules and rates by September 1, 1983, five months from the date of the statute's enactment. The interim final rules were to take effect October 1, 1983. The Secretary was to publish final rules, after allowing for "a period of public comment," by December 31, 1983.[18]

The Secretary published the interim final rules on September 1, 1983.[19] Although suggesting that erroneous indexes would be corrected, the interim final rules were silent about the timing of any corrections. They stated:

> If we discover that we, or BLS, have made any error that results in an incorrect wage index for an area, we will direct the Medicare intermediaries to recalculate the payment rates.

48 Fed.Reg. at 39,765. Following the September 1 publication, the Secretary received comments from at least two large health care provider organizations, which identified the ambiguity in the interim final rules and urged retroactive application of wage index corrections (at least with respect to those corrections that would benefit Medicare providers). The Secretary published the final rules on January 3, 1984, four days after the statutory deadline.[20] The preamble to the final rules presented the prospective-only policy. *See* 49 Fed.Reg. 234, 258–59 (Jan. 3, 1984).

■ Because the Secretary did not promulgate the PPS regulations in accordance with the APA, which requires advance notice of proposed rulemakings,[21] but did invoke the "good cause" exception, the court must decide whether the 1983 Amendments authorized special rulemaking procedures that provide sufficiently "good cause" for exempting this rulemaking from APA constraints.[22] The court has made clear that exceptions to APA procedures are to be "narrowly construed and only reluctantly countenanced." *New Jersey v. EPA,* 626 F.2d 1038, 1045 (D.C.Cir.1980).

■ The APA permits an agency to waive the notice and comment procedure when it has good cause to find such notice and comment "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). As a general matter, "strict congressionally imposed deadlines, without more, by no means warrant invocation of the good cause exception." *Petry v. Block,* 737 F.2d 1193, 1203 (D.C.Cir.1984). Nevertheless, deviation from APA requirements has been permitted where congressional deadlines are very tight and where the statute is particularly complicated. Thus, in *Petry v. Block,* 737 F.2d at 1200–02, the court concluded that the passage of a complex and "extraordinary" statute (concerning changes

---

**18.** Section 604(c) provides:

　(1) The Secretary shall cause to be published in the Federal Register a notice of the interim final DRG prospective payment rates ... no later than September 1, 1983, and allow for a period of public comment thereon. Payment on the basis of prospective rates shall become effective on October 1, 1983, without the necessity for consideration of comments received, but the Secretary shall, by notice published in the Federal Register, affirm or modify the amounts by December 31, 1983, after considering those comments.

　(2) A modification under paragraph (1) that reduces a prospective payment rate shall apply only to discharges occurring after 30 days after the date the notice of the modification is published in the Federal Register.

　(3) Rules to implement [PPS] shall be established in accordance with the procedure described in this subsection.

　97 Stat. 168–69.

**19.** *See* 48 Fed.Reg. 39,752 (Sept. 1, 1983).

**20.** The Secretary submits, and we accept, that the four-day delay between the statutory deadline of December 31 and the January 3 publication date—over a holiday weekend—constitutes a "de minimis" violation of the statute with no effect on the validity of the final rules. The hospitals point to no evidence that they were prejudiced by this minor delay.

**21.** *See* 5 U.S.C. § 553(b).

**22.** The Secretary invoked the "good cause" exception in both the interim final PPS rules, *see* 48 Fed.Reg. at 39,902 (waiver of notice and comment), and the final rules. *See* 49 Fed.Reg. at 311 (waiver of 30–day delay of effective dates). Although the district court relied in part on the "good cause" exception to uphold the Secretary's policy and the Secretary's brief features this argument prominently, the hospitals have not addressed it in their main or reply briefs.

in administrative reimbursements under the Child Care Food Program) that imposed a 60–day deadline for the promulgation of interim rules justified the agency's invocation of the "good cause" exception.

Although the time period between the enactment and implementation deadline was longer in the instant case than in *Petry*, the regulatory framework was equally if not more complex. Between the April 20 enactment and the September 1 deadline, the Secretary faced the daunting task of preparing regulations to implement a complete and radical overhaul of the Medicare reimbursement system. Once published, the interim rules took up 133 pages in the Federal Register: 55 pages of explanatory text, 37 pages of revised regulations, and 41 pages of new data tables. *See* 48 Fed.Reg. 39,752. Like *Petry*, then, this case is different from those where the agency "had a substantial period of time within which to propose regulations, the promulgation of which it knew was both necessary and forthcoming in the future." *American Fed. of Gov't Emp. v. Block*, 655 F.2d 1153, 1158 (D.C.Cir.1981) (citing *Kollett v. Harris*, 619 F.2d 134 (1st Cir.1980)). Nor does this case raise the specter of abuse, where "an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory ... deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures." *Council of Southern Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C.Cir. 1981).

The Secretary's approach to the PPS regulatory process followed the rulemaking process prescribed by Congress in § 604(c). In contrast to the procedure set by the APA, § 604(c) required the Secretary to issue interim final rules immediately, which would then be *followed* by an opportunity for public comment. Thus, unlike those cases where the court has found strict deadlines alone insufficient to establish good cause, *see New Jersey v. EPA*, 626 F.2d 1038, 1043–45 (D.C.Cir.1980), here Congress has expressed its clear intent that APA notice and comment procedures need not be followed. *Cf. Air Transport Ass'n of America v. Dep't of Trans.*, 900 F.2d 369, 379 (D.C.Cir.1990)

(statutory deadline does not constitute good cause absent express Congressional intent to this effect), *remanded,* 498 U.S. 1077, 111 S.Ct. 944, 112 L.Ed.2d 1033 (1991), *vacated as moot,* 933 F.2d 1043 (D.C.Cir.1991). Under these circumstances, we conclude that the strict deadlines and special procedures imposed by the 1983 Amendments constituted sufficiently "good cause" under 5 U.S.C. § 553(b)(B) for bypassing the APA's notice and comment requirement.

■ The question remains whether the Secretary's prospective-only policy was adopted in compliance with § 604(c)'s special procedures. The hospitals contend that the special procedures do not apply because the Secretary did not publish the new policy in the September 1 interim final rule. They emphasize that the interim final rules stated only that the Secretary would "recalculate" erroneous wage indexes. Without notice that the Secretary might interpret "recalculate" to mean "prospectively recalculate," the hospitals maintain that the prospective-only policy was not subject to the subsequent comment period contemplated by § 604(c).

The Secretary's persuasive response is that the final policy statement merely "modified" the policy articulated in the September 1 statement in the interim final rule. The special rulemaking procedures in § 604(c)(1) specifically contemplated the possible modification of the interim final rules. Accordingly, the Secretary maintains, the transformation of the initial statement (that erroneous data would be recalculated) to the final prospective-only policy is analogous to the "logical outgrowth" permitted for final rules promulgated under the APA. *See Conn. Light and Power Co. v. NRC,* 673 F.2d 525, 533 (D.C.Cir.1982), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76.

In the context of a fundamental policy shift, such as the change from a reasonable-cost regime to a prospective payment regime, it was foreseeable that the Secretary might alter her methodology with respect to error correction. Indeed, the ambiguity toward retroactivity in the interim final rules did alert two major providers, which responded with comments. Although the Secretary adopted a policy that differed from the one

advocated by the commentators, she indicated in the final rules that attention had been paid to the alternatives.[23] *See Petry v. Block,* 737 F.2d at 1203 (quoting *Levesque v. Block,* 723 F.2d 175, 188 (1st Cir.1983)). Under these circumstances, we conclude that a prospective-only policy toward error correction constitutes a sufficiently "logical outgrowth" from an initial statement indicating that errors would be recalculated. Thus the changes from interim final rules to the final rules fell within § 604(c)'s allowance for modifications following public comment.

Accordingly, we affirm the grant of summary judgment to the Secretary.

**23.** The final rules state, for example, that the Secretary "considered retroactively adjusting the prospective payment rates for corrections in the wage index.... [but] for a number of reasons ... did not adopt this approach." 49 Fed.Reg. at 258.