**APPALACHIAN REGIONAL HEALTHCARE, INC.,**
**Appellant,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Appellee.**

**No. 96–5215.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 14, 1997.

Decided Dec. 23, 1997.

Joe W. Fleming, II, Washington, DC, argued the cause and filed the briefs for appellant.

Jeffrey G. Micklos, Attorney, United States Department of Health and Human Services, Washington, DC, argued the cause for appellee, with whom Frank W. Hunger, Assistant Attorney General, United States Department of Justice, Mary Lou Leary, United States Attorney, Harriet S. Rabb, General Counsel, United States Department of Health and Human Services, Robert P. Jaye, Acting Associate General Counsel, and Henry R. Goldberg, Deputy Associate General Counsel, were on the brief.

Jeffrey G. Micklos, Attorney, United States Department of Health and Human Services, argued the cause for appellee, with whom Frank W. Hunger, Assistant Attorney General, United States Department of Justice, Mary Lou Leary, United States Attorney, Harriet S. Rabb, General Counsel, United States Department of Health and Human Services, Robert P. Jaye, Acting Associate General Counsel, and Henry R. Goldberg, Deputy Associate General Counsel, were on the brief.

Before: SILBERMAN, SENTELLE, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Circuit Judge SENTELLE.

SILBERMAN, Circuit Judge:

Appalachian Regional Healthcare contends that the Provider Reimbursement Review Board unreasonably interpreted the Medicare as Secondary Payer provisions of the Social Security Act, 42 U.S.C. § 1395y(b) (1994), in approving the reduction of Appalachian's Medicare reimbursements for the fiscal years ending 1985 through 1991. The district court disagreed, and entered summary judgment in favor of the Secretary of Health and Human Services. We affirm the judgment.

**I.**

Appalachian Regional Healthcare, Inc., a nonprofit Kentucky corporation, owns and/or operates 10 hospitals in Kentucky, Virginia, and West Virginia. It has entered into Medicare provider agreements with the Secretary of Health and Human Services and its hospitals thus are qualified to receive Part A reimbursement for the inpatient health care services they provide to covered beneficia-

ries. Appalachian is reimbursed under the Prospective Payment System (PPS) created by section 601 of the Social Security Amendments of 1983, codified at 42 U.S.C. § 1395ww(d) (1994). Although a detailed explanation of this rather complex system is not required here, roughly, PPS requires the Secretary to classify a covered beneficiary's discharge into one of approximately 500 Diagnosis Related Groups (DRG), "based on essential data abstracted from the inpatient bill for that discharge." 42 C.F.R. § 412.60(c) (1996). Reimbursement depends on the DRG to which a patient is assigned and the average cost of treating such a diagnosis, "regardless of the [actual] number of conditions treated or services furnished during the patient's stay." 42 C.F.R. § 412.60(c)(2) (1996). A provider, therefore, is reimbursed the same amount for each similarly classified patient discharge, even if the actual cost of caring for patients in that DRG varies.[1] Until PPS was enacted, providers were reimbursed under a cost-based system, whereby Medicare paid either a hospital's customary charge for or the reasonable cost of a particular item or service, whichever was lower. *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C.Cir.1994).

Appellant's annual reimbursement is calculated based on the annual cost report it must submit to its so-called "fiscal intermediary," Blue Cross/Blue Shield of Kentucky, which is authorized, as the Secretary's agent, to audit and, if necessary, adjust Appalachian's report. The intermediary thought Appalachian's cost reports for fiscal years ending 1985, 1986, 1987, 1988, 1989, 1990, and 1991 reflected a misreading of section 1862(b) of the Social Security Act, 42 U.S.C. § 1395y(b) (1994), known as the Medicare as Secondary Payer (MSP) provisions, and reduced Appalachian's reimbursement by $1,010,414.[2] It is the Secretary's reading of these provisions,

---

1. The effect of PPS is that if a hospital can treat a particular diagnosis more efficiently than the average hospital, it will make money, as it may keep the difference between its actual cost and the PPS payment for a particular DRG. Conversely, if its costs are above average, the hospital must accept a shortfall.

2. The precise amounts in issue for each fiscal year are: FY ending 1985: $49,112; FY ending 1986: $159,206; FY ending 1987: $127,803; FY ending 1988: $79,853; FY ending 1989: $147,157; FY ending 1990: $225,229; FY ending 1991: $222,054. Appalachian seeks judgment in the total amount, plus interest on the judgment as allowed by 42 U.S.C. § 1395oo(f)(2) (1994).

in light of the statutory change in method of reimbursement, that gives rise to the parties' dispute.

Section 1862(b)(2) of the MSP provisions forbids the Secretary from making payment under Part A "with respect to any item or service" to the extent that payment has been or reasonably can be expected to be made by a primary payer—other health insurance, such as worker's compensation, an employer group health plan, or liability insurance. During the fiscal years at issue, Appalachian's hospitals provided services to Medicare beneficiaries who were also covered under other health insurance—primarily coal miners covered under the black lung benefits program administered by the Division of Coal Mine Workers Compensation of the United States Department of Labor. The black lung program, however, only pays for those medical services related to pneumoconiosis. Thus, the payments Appalachian received from Labor—which included a markup over cost—were in full satisfaction of the hospitals' charges for only certain items of care, such as pulmonary x-rays or the use of a respirator. Section 1862(b)(2), then, prohibited the Secretary from making payment for those items or services paid for by the black lung program, but was ambiguous as to how the Secretary could keep from doing so under the PPS system.

Appellant thought it was entitled to keep its profit margin on the payments received from the black lung program (and other primary payers); it therefore offset only the portion of those payments representing a hospital's *costs* against Medicare's PPS reimbursement. Blue Cross/Blue Shield interpreted the MSP provisions to require instead that the *entire* primary payment be deducted from the total PPS reimbursement that otherwise would have been due the provider. The following example illustrates the difference. Assume that Medicare's PPS reimbursement to Appalachian for having provided six services to a covered beneficiary during an inpatient stay was $20. Assume further that two of those services fell within the coverage of the black lung program, for which Labor paid $15. The intermediary would subtract the full $15 primary payer payment from the $20 PPS payment that would have been made had there been no other insurance, leaving a PPS reimbursement of $5 to be made. Appalachian, however, would offset only that portion of the $15 payment attributable to the hospital's costs against the $20 PPS payment. Using the fiscal year 1987 cost to charge ratio (a number representing a hospital's average markup as determined by the intermediary) for one of Appalachian's 10 hospitals—.658—Appalachian would have multiplied the $15 primary payer payment by the .658 cost to charge ratio, and would deduct the product—$9.87—from the $20 PPS payment, leaving a PPS payment of $10.13 to be made. Under its method, then, Appalachian would be reimbursed $10.13 + $15 = $25.13, placing them in "substantially the same position" with respect to primary payer payments as it was prior to the enactment of PPS. Under the intermediary's approach, by contrast, the provider could never receive more in combined payments than it would have received from Medicare in the absence of other insurance coverage.

Appalachian sought review of the intermediary's adjustments by the Provider Reimbursement Review Board. The Board issued five separate decisions, which were, Appalachian informs us, identical in all material respects, affirming Blue Cross/Blue Shield's adjustments in each fiscal year. The Secretary's delegate, the Administrator of the Health Care Financing Administration, declined to review the Board's decision. Left undisturbed, the Board's decision constituted final agency action reviewable by statute in the district court for the District of Columbia. *See* 42 U.S.C. § 139500(f)(1) (1994).

## II.

We note at the outset the limited nature of appellant's claim. Recognizing the statute's ambiguities, Appalachian does not assert that its cost exclusion method is the only permissible way to construe the MSP provisions in this context.[3] Rather, it argues that the

---

3. Appellant in fact concedes that the Secretary has discretion to adopt a reasonable method of

Board's reading (in effect, the Secretary's) of those provisions is unreasonable. The operative portion of the Board's decision interpreting the statute is as follows:

> The Board finds that § 1862(b)(2) of the Act provides that payment may not be made with respect to any item or service to the extent payment has been made or can reasonably be made from a primary payer. Section 1862(b)(4) of the Act makes provision for coordination of benefits when the payment by a primary payer for an item or service is less than the full charge. The Board finds this permits payment by the Medicare program for the remainder of such charge, but *may not exceed the amount Medicare would pay if there were no primary payer.* Therefore, the Board concludes the amount Medicare would pay ... was properly reduced by primary payer payments.

Appalachian asserts that in this passage, the Secretary has taken the position perforce that *all* items and services provided during an inpatient stay constitute a single item or service for purposes of the MSP provisions. This construction, Appalachian contends, is plainly contrary to the statute, or alternatively, is unreasonable, because the statute defines the term "inpatient hospital services" as something composed of the *several* individual items and services furnished to a hospital inpatient during a particular hospital stay. *See* 42 U.S.C. § 1395x(b) (1994). All the items and services provided during a hospital admission, therefore, may not be considered one single item or service.[4]

The district court agreed that the Secretary had interpreted "item or service" to mean the entire inpatient hospital admission. Nevertheless, the judge thought that the Secretary's construction, although awkward,

was not unreasonable in light of the enactment of PPS and the design of the statute as a whole, and therefore was entitled to *Chevron*[5] deference. We think the district judge was correct in concluding that the statute is ambiguous and that *Chevron* governed, although we are not sure the Board's decision actually construed the phrase "item or service."

The Board recognized that § 1862(b)(2) prohibits Medicare from duplicating payments made by a primary payer. But the truth of the matter is that when PPS replaced the cost-based reimbursement system, § 1862(b)(2) became ambiguous as applied to this sort of situation. It is easy to see how this provision operated when Medicare's payment directly corresponded to charges for particular items or services, as it did under the cost-based system. If a primary payer paid for a particular item or service, Medicare did not. A PPS payment is instead in full satisfaction of the bundle of covered items and services provided during a single inpatient hospital stay. It is certainly in some sense payment for each of the individual items or services that compose the bundle. But because a PPS payment is calculated without regard to a hospital's actual cost, it cannot be easily separated and allocated to particular items or services. The Secretary, then, had to figure out a way not to make "payment ... with respect to any item or service" covered by a primary payer given that its PPS reimbursement payment is not cost-based and not directly connected to items or services.

Faced with this ambiguity, the Board understandably looked to the MSP provisions as a whole for guidance. The Board derived the general principle that the sum of all

---

excluding primary payer payments for items or services from the PPS payment.

4. As additional support, Appalachian points to this statement by counsel for Blue Cross/Blue Shield made before the Board: "The approach that ... the Intermediary uses, and we believe the statute really contemplates, is that the hospital admission, that's a service." Of course, the intermediary's position is not the Secretary's—it is the Board's interpretation that matters. In any event, we think it plain that a statement by intermediary's counsel in the course of an inter-

nal quasi-adjudicatory proceeding "is not the sort of 'fair and considered judgment' that can be thought of as an authoritative departmental position." *Paralyzed Veterans of Am. v. D.C. Arena L.P.,* 117 F.3d 579, 587 (D.C.Cir.1997) (quoting *Auer v. Robbins,* —— U.S. ——, ——, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997)).

5. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

payments should not exceed the amount Medicare would pay if it were the only insurer from the (b)(4) coordination of benefits provision. We think it entirely reasonable in interpreting the statute for the Board to have done so. As the government points out, we have said that the MSP provisions were enacted as a cost-cutting measure, *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 414 (D.C.Cir.1994), and the Secretary's interpretation is consistent with this cost-cutting objective. While the Board's interpretation of § 1862(b)(2) may have had the same *effect* as if it had explicitly interpreted "item or service" in the way that Appalachian suggests, the Board did not explicitly adopt that *rationale*. Even if it had done so we do not think it much matters. The statutory amendment authorizing the PPS reimbursement method created inevitable tension with the concept of payment for items and services, and the Secretary's general resolution of the resulting ambiguity is a permissible interpretation of the statute. To be sure, this case would be easier had the Board provided a more thorough explanation for its decision. But the Board's decision is nevertheless "tolerably terse," *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), and a reading which we can accept, especially in light of the particular deference we afford the Secretary given the tremendous complexity of the Medicare statute. *See Methodist Hosp.*, 38 F.3d at 1229.

Appellant nevertheless asserts that the Secretary's position is merely a litigating one and therefore is not entitled to deference. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). First, the hospital claims that the Secretary's position is unsupported by regulations, rulings, or administrative practice. We do not understand this since we do have the Board's adjudicatory decision, and we have already concluded that its statutory interpretations are entitled to deference. *Marymount Hosp. v. Shalala*, 19 F.3d 658, 661 (D.C.Cir.1994). Appellant also claims that the Secretary's *counsel's* interpretation of the Board's decision is not entitled to deference in this litigation. We agree that the Board's decision must stand on its own—counsel cannot justify the Board's decision

before us with an explanation that the Board itself did not rely upon. But the fact that we think the Secretary's explanation is the better reading of the Board's brief opinion does not, of course, mean that we are deferring to government counsel's explanation.

The district court's judgment is affirmed.

SENTELLE, Circuit Judge, dissenting:

As the majority makes clear, the validity of the Secretary's action in this case, and therefore of the district court decision upholding it, depends upon the validity of the interpretation of § 1862(b) of the Social Security Act, 42 U.S.C. § 1395y(b) (1994), by the Provider Reimbursement Review Board. The relevant portion of that statute provides that

> payment under this subchapter may not be made ... with respect to any item or service to the extent that ... payment has been made or can reasonably be expected to be made promptly ... under a workmen's compensation law or plan of the United States or a State....

42 U.S.C. § 1395y(b)(2)(A). The administration of this section may have been fairly straightforward before the 1983 amendments to the Social Security Act, which switched the reimbursement system from a cost-based system in which the troublesome phrase "item or service" had an evident meaning and relevance, to the present Prospective Payment System ("PPS") described in the majority opinion in which the meaning and relevance of that phrase is, as the majority establishes, not at all apparent. We are all in agreement that to survive the two-step analysis drawn from *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Board's ruling (as applied by the Secretary) need not be perfect, or even the best, but only reasonable. The Secretary's counsel, the district court, and the majority have all done yeoman's work in demonstrating the possible reasonableness of an interpretation of a statute whose critical wording is probably the result of a congressional oversight in failing to amend by deletion a no longer sensible operative phrase. My difficulty lies in the fact that neither the Board

nor the Secretary did the same yeoman's work.

Our review at the second step of *Chevron* partakes of a nature similar to the arbitrary and capricious review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Independent Petroleum Ass'n of America v. Babbitt,* 92 F.3d 1248, 1258 (D.C.Cir.1996). Therefore, even under our deferential review, an agency's interpretation of an ambiguous statute must at least be a reasoned one in order for us to determine if it is reasonable. Again, the majority and I are not in disagreement as to the standard employed. The majority expressly upholds the Board's (and therefore the Secretary's) decision because it finds the Board's recorded reasoning to be "tolerably terse," a styling drawn, quite properly, from *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir. 1970). That decision, pre-dating *Chevron,* recognized in the context of administrative procedure review that "reasoned decision-making remains a requirement of our law." *Id.* My disagreement with the majority is a narrow one. That is, although I believe the majority is correct in the framework of its review, I part company with· it only at the point of whether the agency action has "cross[ed] the line from the tolerably terse to the intolerably mute." *Id.*

*Greater Boston* establishes that in drawing the line between tolerable terseness and intolerable muteness the court will uphold an agency where its reasoning, "though of less than ideal clarity," is such that "the agency's path may reasonably be discerned." *Id.* at 851. Here, the Board's decision required it to interpret the concededly ambiguous statute governing payment for "any item or service to the extent that ... payment has been made or can reasonably be expected to be made," by a plan contemplated in the statute in a context in which items and services were no longer key to agency payment, but payment was being made by a covered plan where that collateral source might or might not cover all the costs of a patient's treatment depending upon whether the patient had medical needs supplied that were not directly encompassed within the pneumoconiosis diagnosis. In common with appellant, I do not see how the Board could have accomplished this task without construing the meaning of the term "any item or service" in the PPS context.

As the majority suggests, appellant understands the Board's decision as having construed the phrase to mean that "item or service" encompassed the entire inpatient hospital admission, an understanding shared by the district court. Although the question is not free from doubt, I also think that is what the Board did. I understand the majority's disagreement with appellant, however, because I find it impossible to determine with any certainty from the "operative portion of the Board's decision interpreting the statute," Maj. op. at 1053, precisely what the Board did. As the portion the Board's decision excerpted in the majority opinion reveals, the key sentence of the operative portion in construing § 1862(b)(4) reads: "the Board finds this permits payment by the Medicare Program for the remainder of this charge, but *may not exceed the amount Medicare would pay if there were no primary payer.*" (Emphasis in the original.) This is the whole of the Board's reasoning. Not only do I not know what it means, it doesn't even make grammatical or syntactical sense. Either the clause "but may not exceed the amount Medicare would pay if there were no primary payer," has no subject, or the subject of the subordinate clause is the same as the subject of the independent clause to which it is appended, to wit "this." The antecedent of the pronoun "this" comes from the immediately preceding sentence which reads: "§ 1862(b)(4) of the Act makes provision for coordination of benefits when the payment by a primary payer for an item or charge is less than the full charge." Therefore, reading the questionable clause with "this" as its subject, makes it read "this may not exceed the amount Medicare would pay if there were no primary payer," where "this" is the entire preceding sentence—a sentence which neither exceeds nor equals any payment. In short, I find the Board's statement of its reasons meaningless. A meaningless statement is intolerably mute, not tolerably terse.

I am further troubled that the Board's statement, whatever it means, does not pro-

vide reasoning supportive of the interpretation of the statute which it and the Secretary seem to have adopted. It is true that something "may not exceed the amount Medicare would pay if there were no primary payer." For example, the amount paid by Medicare may not exceed that amount. It does not necessarily follow that the sum of Medicare reimbursement for an "item or service" and the workmen's compensation primary payment for an admission inclusive of that "item or service" cannot exceed the amount Medicare would pay if there were no primary payer. The latter formulation is not inconsistent with the Board's opinion; it is simply not supported by it. Thus, I find that the Board's reasoning is at best opaque and at worst a *non sequitur*.

I am not suggesting that the Board's interpretation, accepted by the Secretary, is inherently an impermissible one. Further, I agree with the majority that the Board was faced with an ambiguity that rendered it entirely reasonable for the Board to "look[ ] to the [Medicare as Secondary Payer] provisions as a whole for guidance." Maj. op. at 1053. Further, I am prepared to join with the majority in deferring to a reasoned interpretation that does just that. However, on the present record, I do not find such a reasoned interpretation to which we can defer. Therefore, I would vacate and remand to the district court for further remand to the Secretary to provide a reasoned decision, lacking on the present record.