**HCA HEALTH SERVICES OF TENNESSEE, INC., et al.,**
Plaintiffs,

v.

Tommy G. **THOMPSON,** Secretary of the United States Department of Health and Human Services, Defendant.

No. 3:00–0991.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 2, 2002.

TN, for HCA Health Services of Tennessee, Inc., Hospital Corporation of Tennessee, SP Acquisition Corp., Athens Community Hospital, Inc., Medical Park Hospital, Inc., Benton Community Hospital, Inc., Hospital Corporation of America, General Care Corp., Indian Path Hospital, Inc., Hospital Corporation of White County, Hartselle Medical Center, Inc., Community Hospital of Andalusia, Inc., L.V. Stabler Memorial Hospital of Greenville, Inc., Hospital Corporation of Northwest, Inc., Community Hospital of DeQueen, Inc., Encino Hospital Corporation, Inc., Sebastopol Hospital Corporation, HCA Hospital Services of San Diego, Inc., Ukiah Hospital Corporation, Los Robles Regional Medical Center, Community Hospital of La Habra, Inc., Chino Community Hospital Corporation, Inc., North Okaloosa Medical Center, Inc., Medical Center of Santa Rosa, Inc., Central Florida Regional Hospital, Inc., Sarasota Doctors Hospital, Inc., Northwest Medical Center, Inc., New Port Richey Hospital, Inc., North Florida Regional Medical Center, Inc., Hospital Corporation of Lake Worth, HCA Health Services of Florida, Inc., University Hospital, Ltd., West Florida Regional Medical Center, Inc., Putnam Hospital, Inc., Bay Hospital, Inc., Lawnwood Medical Center, Inc., Largo Medical Center, Inc., Okeechobee Hospital, Inc., Tallahassee Medical Center, Inc., EHCA Northlake, LLC, Fairview Park, LP, Clayton Acquisition Corp., Colliseum Medical Center, LLC, Redmond Park Hospital, Inc., EHCA West Paces, LLC, Corporation, EHCA Parkway, LLC, Columbus Doctors Hospital, Inc., Hospital Corporation of Lanier, Inc., HCA Health Services of Georgia, Inc., West Valley Medical Center, Inc., Terre Haute Regional Hospital, Inc., HCA Health Services of Indiana, Inc., Wesley Medical Center, LLC, Meadowview Regional Medical Center, LLC, Springview Hospital, Inc., Bourbon Cummunity Hospital, LLC, Logan

----

H. Lee Barfield, II, W. Brantley Phillips, Jr., Bass, Berry & Sims, Nashville,

Memorial Hospital, LLC, Georgetown Community Hospital, LLC, Hospital Corporation of America, Greenview Hospital, Inc., Frankfort Hospital, Inc. HCA Health Services of Louisiana, Inc., HTI Health Services, Inc., St. Peter's Community Hospital, Inc., Guadalupe Medical Center, Inc., Hobbs Community Hospital, Inc., HCA–Raleigh Community Hospital, Inc., HTI Health Services of North Carolina, Inc., Hospital Corporation of North Carolina, Cumberland Medical Center, Inc., Willamette Valley Medical Center, LLC, Walterboro Community Hospital, Inc., Trident Medical Center, LLC, Columbia North Hills Hospital Subsidiary, LP, Victoria Hospital Corporation, Wysong Medical Center, Inc., Columbia Navarro Regional Hospital Subsidiary, LP, Piney Woods Healthcare Systems, LP, Spring Branch Medical Center, Inc., Doctors Hospital (Conroe), Inc., CHCA West Houston, LP, Columbia Medical Center of Plano Subsidiary, LP, Malone–Hogan Hospital, Inc., Columbia Valley Healthcare Systems, LP, Columbia Plaza Medical Center of Fort Worth Subsidiary, LP, Longview Regional Hospital, LP, Columbia Rio Grande Healthcare, LP, Columbia/St. David's Healthcare System, LP, Columbia Medical Center at Lancaster Subsidiary, LP, Methodist Healthcare System of San Antonio, Ltd., Castleview Hospital, LLC, HTI of Utah, Inc., Hospital Corporation of Utah, Lewis–Gale Medical Center, LLC, Northern Virginia Hospital Corporation, Reston Hospital Center, LLC, Pulaski Community Hospital, Inc., Columbia Capital Medical Center Limited Partnership, Tri–Cities Health Service Corp., Raleigh General Hospital, Teays Valley Health Services, Inc., Riverton Memorial Hospital, LLC, HCA Health Services of Oklahoma, Inc., General Health Services, Inc.

W. Brantley Phillips, Jr., for Dauterive Hospital Corporation, El Paso Healthcare System, Ltd., Columbia Medical Center of Arlington Subsidiary, LP.

Michael L. Roden, Office of the United States Attorney, Nashville, TN, David T. Zaring, Department of Justice Civil Division, Washington, DC, for Tommy G. Thompson.

## MEMORANDUM

ECHOLS, District Judge.

Presently pending before the Court are Plaintiffs' Motion for Summary Judgment (Docket Entry No. 11), to which Defendant responds in opposition, and Defendant's Motion for Summary Judgment (Docket Entry No. 13), to which Plaintiffs respond in opposition. For the reasons explained herein, Plaintiffs' motion will be DENIED, and Defendant's motion will be GRANTED. Accordingly, this case will be DISMISSED.

### I.

One hundred twelve hospitals seek judicial review, pursuant to 42 U.S.C. § 1395oo(f)(1) (2000) and 5 U.S.C. § 702 (2000), of an administrative decision by the Secretary of the United States Department of Health and Human Services denying certain Medicare reimbursements for fiscal years 1984 through 1986. Plaintiffs ask the Court to reverse the Secretary's decision and compel the Secretary to pay the disputed Medicare reimbursements, interests, and costs. After the Secretary filed an Answer (Docket Entry No. 5), the parties filed cross motions for summary judgment. The parties agree that no discovery is necessary and have submitted the case for decision on the administrative record and briefs alone. This Court has federal question jurisdiction. *See* 28 U.S.C. § 1331 (1994).

### II.

■ Under the Administrative Procedure Act, courts must "hold unlawful and

set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law...." 5 U.S.C. § 706(2)(A) (2000). Under this standard, a court's inquiry is " 'searching and careful,' yet in the last analysis, diffident and deferential." *GTE Midwest, Inc. v. FCC*, 233 F.3d 341, 344–45 (6th Cir.2000) (quoting *Natural Res. Def. Council v. SEC*, 606 F.2d 1031, 1041 (D.C.Cir.1979) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971))). "Nonetheless, the agency must articulate a 'rational connection between the facts found and the choice made,' and must 'provide something in the way of documentary support' for its action." *Id.* at 345 (quoting *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1165 (D.C.Cir.1987), *Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 764 (6th Cir. 1995)).

■ When a court reviews an agency's construction of the statute that it administers, it must follow the familiar two-step analysis first set out in *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "First, always, is the question whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. "If, by 'employing traditional tools of statutory construction,' we determine that Congress' intent is clear, 'that is the end of the matter.' " *Regions Hosp. v. Shalala*, 522 U.S. 448, 457, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998) (quoting *Chevron*, 467 U.S. at 842, 843 & n. 9, 104 S.Ct. 2778). Second, " 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.' " *Id.* (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). "If the agency's reading fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that

reading controlling weight, even if it is not the answer 'the court would have reached if the question had initially arisen in a judicial proceeding.' " *Id.* (quoting *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. 2778).

### III.

**A.** HOSPITAL REIMBURSEMENT UNDER MEDICARE AND THE PROSPECTIVE PAYMENT SYSTEM (PPS)

The Medicare program, established in 1965, provides federally funded health insurance for the elderly and disabled. *See* 42 U.S.C. § 1395–1395ggg (2000). The Secretary of the Department of Health and Human Services, who is currently Defendant Tommy Thompson, is responsible for administering the Medicare program. *See* 42 U.S.C. § 1395kk. The Secretary has in turn delegated much of that responsibility to the Centers for Medicare and Medicaid Services, which, at the time of the events that led to this lawsuit, was known as the Health Care Financing Administration.

This case concerns what is known as "Part A" of the Medicare program. Under Part A, the Secretary reimburses qualified hospitals for certain costs that they incur in treating Medicare beneficiaries. A hospital may participate in the Medicare program as a "provider of services" by entering into a "provider agreement" with the Secretary. Providers then receive Medicare reimbursements directly from the Secretary or, more commonly, through a "fiscal intermediary" appointed by the provider. *See* 42 U.S.C. § 1995g–h. The fiscal intermediary, usually a private insurance company, acts as an agent of the Secretary for the purpose of processing and paying providers' claims' for reimbursement, and the fiscal intermediary must apply the Medicare statutes and the Secretary's rules and regulations in mak-

ing its determination as to the proper amount of each reimbursement. *See* 42 U.S.C. § 1395h; 42 C.F.R. § 405.1803 (2001). Plaintiffs in this case all entered into provider agreements with the Secretary.

Before October 1, 1983, Medicare reimbursed providers based on the lower of the "reasonable costs" or "customary charges" of inpatient services furnished to Medicare patients. *See* 42 U.S.C. § 1395f(b) (1988); *see generally Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 405–06, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) (discussing pre–1983 reimbursement scheme). Under this regime, the Secretary reimbursed providers for the actual costs that they incurred, provided they fell within certain cost limits. Thus, as hospital costs increased, so too did Medicare reimbursements.

Concerned about escalating Medicare expenditures, Congress in 1983 completely revised the scheme for reimbursing Medicare hospitals. *See* Social Security Amendments Act of 1983, Pub.L. No. 98–21, § 601, 97 Stat. 65, 149. Under the new regime, known as the Prospective Payment System ("PPS"), the Secretary normally reimburses hospitals at a fixed amount for each patient discharged regardless of the actual costs incurred by the hospital for a particular patient. *See* 42 U.S.C. § 1395ww(d)(1). In contrast to hospital reimbursements under the reasonable-cost method, PPS rates do not vary in individual cases. Hospitals instead receive advance notice of the rates at which their services will be reimbursed, regardless of costs actually incurred. Congress designed this system to encourage health care providers to improve efficiency and reduce operating costs:

> The bill is intended to improve the medicare program's ability to act as a prudent purchaser of services, and to provide predictibility [sic] regarding payment amounts for both the Government and hospitals. More important, it is intended to reform the financial incentives hospitals face, promoting efficiency in the provision of services by rewarding cost/effective hospital practices.

H.R.Rep. No. 98–25, at 1, 132 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 351; *see also* S.Rep. No. 98–23, at 1, 53 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 193 ("[PPS amendments] are intended to create incentives for hospitals to operate in a more efficient manner, since hospitals would be allowed to keep payment amounts in excess of their costs and would be required to absorb any costs in excess of the DRG rates.").

The fixed amount paid to hospitals under PPS is based on a standardized rate multiplied by a weighing factor. *See* 42 U.S.C. §§ 1395ww(d)(2)(G), (3)(D). The weighing factor is a multiplier based on each category of inpatient treatment, or "diagnosis-related group" ("DRG"), in which the discharged patient's illness falls. *See generally Good Samaritan Med. Ctr. v. Sec'y of Health & Human Servs.,* 776 F.2d 594, 595 (6th Cir.1985). The Secretary has created 470 DRGs, each with a weight derived from the relative cost to treat a patient in that DRG, *see* 42 U.S.C. § 1395ww(d)(4).

The standardized rate is a base amount that equals the average Medicare allowable cost per discharge for all hospitals participating in the Medicare program in a base year, adjusted according to inflation, regional wage variations, indirect medical education costs, hospital case mix, and other factors. *See* 42 U.S.C. § 1395ww(d)(2). Congress called this standard nationwide cost rate "the DRG prospective payment rate," *see, e.g.,* 42 U.S.C. § 1395ww(d)(1)(A)(i)(II), although it is more commonly known as the "federal rate." *See* 49 Fed.Reg. 234, 251 (Jan. 3,

1984). In calculating this rate, Congress required the Secretary to "determine the [average] allowable operating costs per discharge of inpatient hospital services for the hospital for the most recent cost reporting period for which data are available." 42 U.S.C. § 1395ww(d)(2)(A).

Hospitals first became subject to PPS in fiscal year 1984, beginning on October 1, 1983. *See* 42 U.S.C. § 1395(d)(1)(A)(i). Consequently, the Secretary was required to calculate the federal rate for the first time in 1983. The Secretary determined that "the most recent cost reporting period for which data are available," 42 U.S.C. § 1395ww(d)(2)(A), as of 1983, was calendar year 1981. *See* 48 Fed.Reg. 39,752, 39,763–64 (Sept. 1, 1983) (interim final rule). However, audits of the 1981 data were not yet complete, so the Secretary calculated the federal rate in 1983 using unaudited 1981 cost reports prepared by provider hospitals. *See id.* at 39,763–64; 51 Fed.Reg. 31,454, 31,526 (Sept. 3, 1986). The Secretary subsequently adjusted the federal rate upward each year to account for inflation and other factors specified by Congress. *See* 48 Fed.Reg. 39,752, 39,763–64 (Sept. 1, 1983).

Recognizing that PPS dramatically changed the financing of the country's health-care delivery system, Congress established a four-year phase-in period in order "to minimize disruption that might otherwise occur because of sudden changes in reimbursement levels." S.Rep. No. 98–23, at 53 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 193. During the four-year transition, Medicare reimbursements comprised two portions. The "hospital specific portion" was calculated under the prior system, based on the hospital's actual costs. *See* 42 U.S.C. §§ 1395ww(d)(1)(A), (C). The other portion, the "federal rate," was determined under PPS. *See id.* The hospital specific portion of the reimbursements was 75% in FY 1984, 50% in FY

1985, 45% in FY 1986, and 25% in FY 1987, while the federal rate increased correspondingly. *See* 42 U.S.C. § 1395ww(d)(1)(C). After the transition period, reimbursement was and continues to be based solely on the federal rate. *See* 42 U.S.C. § 1395ww(d)(1)(A)(iii). This appeal concerns the calculation of the federal rate component of Medicare reimbursements for FY 1984, FY 1985, and FY 1986, the first three years of the transition period. (A.R. at 8).

## B. HOSPITAL REIMBURSEMENT FOR MEDICAL MALPRACTICE INSURANCE

Both before and after the 1983 reforms, Medicare has reimbursed hospitals for the costs of medical malpractice insurance associated with Medicare beneficiaries. Before 1979, Medicare reimbursed hospitals for malpractice insurance based on the percentage of each hospital's total patients that were Medicare beneficiaries. "Ultimately, in very simple terms, a hospital in which 40% of the patients were Medicare beneficiaries was reimbursed for 40% of its malpractice insurance premiums." *Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen,* 815 F.2d 1435, 1440 (11th Cir.1987).

The Secretary, however, believed that the pre–1979 method of reimbursing medical malpractice insurance costs caused the Medicare program to pay more than its fair share because Medicare beneficiaries were less likely to obtain medical malpractice awards than were nonbeneficiaries. Consequently, the Secretary promulgated a new rule for reimbursing medical malpractice insurance costs in 1979. Under the 1979 rule, Medicare reimbursed providers for medical malpractice insurance costs based on the percentage of malpractice costs that were paid to Medicare beneficiaries. In other words, in oversimplified terms, a hospital that paid 30% of its total

medical malpractice costs to Medicare beneficiaries was reimbursed for 30% of its total medical malpractice costs even if 40% of that hospital's patients were Medicare beneficiaries. A number of hospitals successfully challenged the 1979 rule in court, and ultimately, eight circuit courts of appeals including the Sixth Circuit invalidated the rule as violative of the Administrative Procedure Act and the Medicare Act. *See Cumberland Med. Ctr. v. Sec'y of Health & Human Servs.,* 781 F.2d 536 (6th Cir.1986); *Bedford County Mem'l Hosp. v. Health & Human Servs.,* 769 F.2d 1017 (4th Cir.1985); *Menorah Med. Ctr. v. Heckler,* 768 F.2d 292 (8th Cir.1985); *Desoto Gen. Hosp. v. Heckler,* 766 F.2d 182 (5th Cir.1985); *Lloyd Noland Hosp. & Clinic v. Heckler,* 762 F.2d 1561 (11th Cir. 1985); *St. James Hosp. v. Heckler,* 760 F.2d 1460 (7th Cir.1985); *Humana of Aurora, Inc. v. Heckler,* 753 F.2d 1579 (10th Cir.1985); *Abington Mem'l Hosp. v. Heckler,* 750 F.2d 242 (3d Cir.1984).

In the wake of this litigation, the Secretary replaced the 1979 malpractice rule with a third malpractice rule in 1986, retroactive to 1979. Then, in 1988, the Supreme Court issued its decision in *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("*Georgetown I*"), which invalidated the retroactive application of a different Medicare reimbursement rule. Based on *Georgetown I,* the Secretary concluded that the courts were unlikely to permit the 1986 malpractice rule to be applied retroactively. Consequently, in 1989, the Secretary agreed not to apply the 1986 malpractice rule to claims filed between 1979 and 1986 and to adjust the outstanding claims of individual hospitals accordingly. *See* HCFA Ruling 89–I, CCH Medicare and Medicaid Guide ¶ 37,614 at 19,186 (1989).

## C. THE EFFECT OF MEDICAL MALPRACTICE INSURANCE REIMBURSEMENT UNDER THE 1979 RULE ON THE PPS RATE AS CALCULATED IN 1983

As previously discussed, the Secretary used unaudited 1981 cost reports to calculate the 1983 PPS rate, which became the basis for all future PPS rates. In 1981, of course, the operative medical malpractice insurance reimbursement rule was the one promulgated in 1979. Thus, providers' 1981 data were supposed to include medical malpractice insurance costs based on the 1979 malpractice rule, although the Secretary estimates that about half of all providers continued to use the pre–1979 rule. *See* 51 Fed.Reg. 31,454, 31,526–27 (Sept. 3, 1986). Consequently, in calculating the medical malpractice insurance component of the FY 1984 PPS rate, about half of the relevant 1981 data on which the Secretary based his calculation was based on the now inoperative 1979 malpractice rule.

In 1986, when the Secretary replaced the 1979 malpractice rule, a number of providers urged the Secretary to revise the PPS rate to adjust for the fact that a component of the PPS rate had been calculated based partly on cost data derived from the vacated 1979 malpractice rule. The Secretary refused, and that decision is at the heart of this case.

## D. THE ADMINISTRATIVE PROCESS FOR REVIEW OF MEDICARE PROVIDER REIMBURSEMENT

Within five months of the end of each fiscal year, a provider must file an annual cost report with its fiscal intermediary. *See* 42 C.F.R. § 413.24(f)(2)(i) (2001). In that report, the hospital lists all Medicare payments to which it believes it is entitled. The fiscal intermediary then reviews the

cost report and determines the total amount of Medicare payments due to the provider, offset by various interim payments already made during that fiscal year. *See* 42 C.F.R. § 405.1803 (2001). The fiscal intermediary's determination is then set forth in a "Notice of Program Reimbursement." *See* 42 C.F.R. § 405.1803 (2001). A provider that "is dissatisfied with a final determination of ... its fiscal intermediary ... as to the amount of total program reimbursement due" may, upon compliance with the statutorily imposed jurisdictional requirements, request a hearing before the Provider Reimbursement Review Board ("the Board"). *See* 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835 (2001). Several providers may join in a single group and appeal to the Board, as in the instant case, "if the matters in controversy involve a common question of fact or interpretation of law or regulations and the amount in controversy is, in the aggregate, $50,000 or more." 42 U.S.C. § 1395oo(b); *see also* 42 C.F.R. § 405.1837 (2001).

If all the jurisdictional prerequisites are satisfied and the Board has the authority to decide the matter, *see* 42 C.F.R. § 405.1873 (2001), the Board may receive evidence, *see* 42 C.F.R. § 405.1851 (2001), and hear oral arguments, *see* 42 C.F.R. § 405.1861 (2001). The Board ultimately issues its decision in writing. *See* 42 C.F.R. § 405.1871 (2001). The Secretary is empowered to review the Board's decision, *see* 42 U.S.C. § 1395oo(f)(1), but has delegated this function to the Administrator of the Centers for Medicare and Medicaid Services, formerly known as the Health Care Financing Administration. *See* 42 C.F.R. § 405.1875 (2001). The Administrator's decision, or the Board's decision if the Administrator elects not to review it, is the final agency decision, and the provider may seek judicial review in federal district court within 60 days of issuance. *See* 42

U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877 (2001).

## E. PLAINTIFFS' APPEAL TO THE BOARD

Plaintiffs in this case appealed their fiscal intermediaries' decisions regarding their PPS payments for FY 1984–86 to the Board. They claimed that their fiscal intermediaries miscalculated their reimbursements because the PPS rate used to calculate the federal portion of their reimbursements was based on 1981 cost reports, which included medical malpractice insurance reimbursements based on the illegal 1979 malpractice rule. Plaintiffs maintained that the Secretary was obligated to adjust the PPS rate to account for the fact that the PPS rate had been calculated using 1981 data that included medical malpractice insurance costs based on the vacated 1979 malpractice rule. Plaintiffs further claimed that not only was the Secretary obligated to adjust the PPS prospectively when the 1979 malpractice rule was withdrawn in 1986, but the Secretary was obligated to adjust the PPS retroactively and reimburse Plaintiffs for the difference in FY 1984, FY 1985, and that part of FY 1986 that preceded the Secretary's promulgation of the 1986 malpractice rule. In the hearing before the Board, Plaintiffs presented the testimony of a consultant who purportedly "recalculat[ed] the PPS rates ... with malpractice costs calculated pursuant to the pre–1979 Rule." (A.R. at 10). After receiving this report, ordering briefing, and hearing testimony, the Board issued a decision rejecting Plaintiffs' claims on August 18, 2000. By letter dated October 17, 2000, the Administrator of the Health Care Financing Administration notified Plaintiffs that he would not review the Board's decision. (A.R. at 1). This suit followed.

## IV.

Based on the administrative record, the parties' briefs, and the comments at oral argument, the parties to agree that this case can be resolved by deciding three purely legal issues:

(1) When the Secretary replaced the 1979 malpractice rule with the 1986 malpractice rule, was it arbitrary and capricious to refuse to adjust the PPS rate prospectively to account for the fact that approximately half of the 1981 cost reports (from which the first PPS rate had been calculated in 1983) had calculated malpractice insurance reimbursement using the 1979 malpractice rule?

(2) If the first question is answered in the affirmative, then was the Secretary's 1986 decision not to adjust the PPS rate retroactively likewise arbitrary and capricious?

(3) Did the Secretary abide by the procedural requirements of the Administrative Procedure Act when he declined to adjust the PPS rate in 1986?

If the Court answers the first question in the affirmative, then the Secretary would have to recalculate Plaintiffs' reimbursement for April 1, 1986, the date the Secretary vacated the 1979 malpractice rule, through the end of FY 1986. If the Court then answers the second question in the affirmative, the Secretary would have to recalculate Plaintiffs' reimbursement for all of FY 1984, FY 1985, and FY 1986. For the reasons that follow, however, the Court answers all three questions in the negative.

## A.

■ Plaintiffs's argument that it was arbitrary and capricious for the Secretary not to adjust the PPS rate prospectively when he replaced the 1979 malpractice rule with the 1986 malpractice rule hinges on 42 U.S.C. § 1395ww(d)(2)(A). Section 1395ww(d)(2)(A) provides that, in calculating the PPS rate for FY 1984, which was the first time the Secretary calculated the PPS rate, "[t]he Secretary shall determine the allowable operating costs per discharge of inpatient hospital services for the hospital for the most recent cost reporting period for which data are available." As previously noted, the Secretary selected 1981 as "the most recent cost reporting period for which data are available." Thus, the first PPS rate was to be calculated based on "allowable operating costs" in 1981.

Plaintiffs maintain that this case "should be resolved under Step One of *Chevron*, because Congress has clearly spoken to what type of costs must be used to determine the federal PPS rate: 'allowable' costs." (Mem.Supp. Pls.' Mot.Summ.J., Docket Entry No. 12, at 14). As Plaintiffs' argument goes, the Secretary did not calculate the PPS rate based on the "allowable operating costs" because there were medical malpractice insurance costs that were allowable under the pre–1979 malpractice rule but that the Secretary did not use in his computation of the PPS rate in 1983 because approximately half of the 1981 data had been derived using the 1979 malpractice rule. According to Plaintiffs, by failing to use "allowable operating costs" to calculate the PPS rate, the Secretary acted arbitrarily and capriciously.

As the Secretary suggests, however, this interpretation of the term "allowable operating costs" is too restrictive. The Secretary had to determine the "allowable operating costs" in 1983. As of 1983, the 1981 data were still subject to revision by the hospitals themselves (through amended cost reports), the fiscal intermediaries (through audit adjustments), the Board, the Administrator, and the courts. Furthermore, as happened in this case, entire sectors of the 1981 data could be subject to revision if a reimbursement rule, such as the malpractice rule, was later invalidated. The Secretary did not have the luxury of

waiting for all of these adjustments to be made: the adjustments would take years, and Congress had mandated that the PPS system be in place by October 1, 1983, using "the most recent cost reporting period for which data are available."[1] Thus, by its nature, the Secretary's calculation of the PPS rate in 1983 had to be imprecise. Although the phrase "allowable operating costs" implies some degree of accuracy, given the expedited implementation required by Congress and the inherent uncertainties of the available data, the Court does not believe that under the circumstances the Secretary was required to determine "allowable operating costs" with the perfect mathematical exactitude that Plaintiffs demand.

The real issue is one that Congress left unaddressed: what was the Secretary to do when subsequent developments, as they inevitably would, revealed inaccuracies in the data used to calculate the PPS rate in 1983? Was the Secretary to leave the PPS rate unchanged, despite inaccuracies, or was the Secretary to "correct" the PPS rate every time a hospital pointed out inaccuracies in the 1981 data? Recognizing that to require the Secretary to revise the PPS rate to account for every known inaccuracy in the 1981 data would be absurdly burdensome, Plaintiffs suggest that the Secretary should have revised the PPS rate in this particular instance because the Secretary's own rule caused the inaccuracies and the inaccuracies were present in approximately half of all cost reports. However, Congress neither required the Secretary to, nor prohibited him from, "correcting" the PPS rate because of flaws in the underlying data. The decision, therefore, of whether to do so was not directly addressed by Congress and it was left to the Secretary's discretion. Accordingly, this issue cannot be resolved under

the first step of *Chevron* because Congress has not directly spoken to the precise question at issue.

The Court must then proceed to the second step of the *Chevron* analysis and determine whether the agency's answer is based on a permissible construction of the statute. In other words, the Court must inquire whether the Secretary's "filling in" of this particular interstice in the Medicare Act was reasonable in light of Congress's overall design. To do so, the Court examines the Secretary's written explanation for the decision as reported in the Federal Register in 1986.

The Secretary based his decision on two rationales, the first being his conclusion that an adjustment to the federal rate to account for the difference between the 1979 and the 1986 malpractice rules would, ironically, actually reduce payments to providers:

> Based on our review of the cost reports, it appears that a large number of hospitals, in order to preserve their rights to appeal the prior malpractice regulation (§ 405.452(a)(1)(ii) (the "1979 rule")), which provided for separate apportionment of malpractice costs, included such costs in the A & G cost center (that is, in accordance with the Medicare reimbursement principles in effect prior to the 1979 rule). The effect of this action on the part of hospitals is that the Federal rates reflect an amount for malpractice costs that is in excess of the amount that would have been recognized had hospitals, in completing their Medicare cost reports, generally adhered to the 1979 rule's provision for separate apportionment of Medicare malpractice costs. We have included no adjustment in the update factor for increased malpractice insurance costs as a result of the interim

**1.** Plaintiffs do not suggested that the selection of the 1981 data as "the most recent cost reporting period for which data are available" was arbitrary and capricious.

final rule.... We are not making any adjustment to the Federal rates for malpractice, and *we note that if such an adjustment were made, it would reduce the rates.* This is because the Federal rates are based upon 1981 unaudited cost reports, and about half the hospitals submitted those cost reports under the regulations in effect prior to the 1979 rule, which provided for greater malpractice payments than provided for by the April 1, 1986 regulation. No downward adjustment was ever made to the 1981 base-year cost data or to the resulting Federal rates to correct for this practice in reporting malpractice costs. Also, we believe that the hospitals that submitted cost reports in accordance with the 1979 regulation are primarily those whose malpractice payments were either increased under the 1979 rule or were minimally reduced by the 1979 regulation. *Thus, there is no reason to believe that the malpractice insurance costs reported in the 1981 cost reports understated Medicare's share of those costs,* and many hospitals clearly and deliberately reported costs so as to overstate Medicare's proper share of the costs.

51 Fed.Reg. 31,454, 31,526–37 (Sept. 3, 1986).

The Secretary further explained, as his second rationale, that in view of the fact that "the Federal rates are generally overstated for a number of other reasons[,] ... it would be inappropriate to increase the rates further to reflect a modification in policy concerning reimbursement of malpractice insurance costs." *Id.* at 31,527.

Apparently, a number of factors had caused the PPS rate to be overstated including (1) that the 1981 data had been unaudited, and (2) there were overestimates of future inflation. *See* 50 Fed.Reg. 35,646, 35,704 (Sept. 3, 1985) (regarding the unaudited data); 50 Fed.Reg. 24,366, 24,395 (June 10, 1985) (the use of unaudited data resulted in "conservatively estimated, at least a one percent overstatement of allowable costs incorporated into the cost data to determine the FY 1985 standardized amounts"); 50 Fed.Reg. 35,-646, 35,703–04 (Sept. 3, 1985) (observing that the Secretary "made assumptions on hospital cost per case increases" that "were significantly higher than the actuarial estimates ... use of these actuarial estimates would reduce the standardized amounts by an additional 1.3 percent."). The Secretary further noted that "both the General Accounting Office and the Department's Office of the Inspector General have conducted studies showing that the Federal rates are overstated." 51 Fed. Reg. 31,526–27 (Sept. 3, 1986) (emphasis added).

In light of this explanation, the Court finds that the Secretary's decision not to adjust the PPS rate to account for the changes in how malpractice insurance costs were calculated was thoughtful and reasonable. The Secretary had good reason to believe that the proposed adjustment to the PPS rate would have actually reduced hospitals' reimbursements, and it seemed clear that Medicare had already overcompensated hospitals under the PPS system. Plaintiffs have not contended that these conclusions were factually inaccurate.[2] Therefore, under *Chevron*'s defer-

---

2. Plaintiffs' expert witness, Dr. Michael Vaida, testified at the administrative hearing that hospitals would have received higher reimbursements if the PPS rate had been adjusted to reflect the pre–1979 malpractice rule. However, Plaintiffs in this case are challenging the Secretary's decision in 1986, (Mem. Supp. Pls.' Mot.Summ.J., Docket Entry No. 12, at 29–30; Pls.' Mem.P. & A. Opp'n Def.'s Mot.Summ.J. & Reply Def.'s Opp'n, Docket Entry No. 17, at 5–6, 9–14), when the operative malpractice rule was the 1986 rule, not the pre–1979 rule. The proper comparison, not made by Plaintiffs' expert, is whether us-

ential standard of review, the Court cannot say that the Secretary's decision was unreasonable.

### B.

■ Having concluded that the Secretary's decision not to revise the PPS rate prospectively to account for the change in the malpractice rule was not arbitrary and capricious, it is unnecessary to reach the issue of whether the Secretary should have adjusted the rates retroactively. If it was not arbitrary and capricious to decline to adjust the PPS rate prospectively, then a *fortiori* it was not arbitrary and capricious to decline to adjust the rates retroactively. Nonetheless, for the purpose of establishing an alternative holding, the Court will consider whether, assuming the Secretary should have adjusted the PPS rate prospectively in 1986, the decision not to adjust the PPS rate retroactively was arbitrary and capricious.

The Court is aware of no controlling legal authority on the issue of whether it is arbitrary and capricious for the Secretary to refuse to make retroactive corrections to the PPS rate even when those rates are in error. However, the United States Court of Appeals for the District of Columbia Circuit addressed the issue in *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225 (D.C.Cir.1994). In that case, the Secretary corrected an erroneous regional wage index, which, like the malpractice insurance reimbursement rate, is a component of the federal rate. However, although the Secretary corrected the regional wage index prospectively, he refused to correct it retroactively. The D.C. Circuit observed:

> The parties do not dispute that the wage index published in September 1983 made use of the most reliable data available to

the Secretary at the time of publication. *See* 48 Fed.Reg. 39,752, 39,765 (Sept. 1, 1983). Because the index is based on available wage data from past years, at any given time the wage index must reflect the Secretary's best approximation of relative regional wage variations. But the hospitals' reading of the statute, taken literally, would not permit such reasonable approximations. Rather, their argument would require the Secretary to make virtually continuous adjustments in the wage index in order to incorporate changing regional wage levels. Such a scheme is not suggested in the 1983 Amendments . . . .

*Methodist Hosp.*, 38 F.3d at 1230.

After concluding that the Medicare Act did not require the Secretary to make retroactive corrections, the D.C. Circuit further concluded that the Secretary's policy against retroactivity was not arbitrary and capricious. *See id.* at 1233. In support of its conclusion, the Court cited a number of rationales for the prospectivity policy. *See id.* at 1232–35. First, finality in the system is important:

> A hospital does not know in advance the total reimbursement that it will receive in a forthcoming fiscal year, due to inevitable variations in its case-mix and caseload. But hospitals, like other businesses, do make projections about future costs and service levels based on their experience and historical patterns. To the extent that the Secretary's prospectivity policy permits hospitals to rely with certainty on one additional element in the PPS calculation rate—the wage index value—the Secretary could reasonably conclude that it will promote efficient and realistic cost-saving targets.

ing the 1986 malpractice rule on the 1981 data would have increased hospitals' reimbursements. The Secretary concluded in

1986 that it would not, and Plaintiffs have presented no evidence that the Secretary was mistaken.

The Secretary refers to this as the "finality" rationale, and we cannot conclude under our deferential standard of review that it is arbitrary and capricious. In addition to promoting efficiency, the Secretary's emphasis on finality protects Medicare providers as well as the Secretary from unexpected shifts in basic reimbursement rates.

*Id.* at 1232. Second, the Court noted the administrative burden of a retroactive policy:

> Because each regional wage index is a component of the national wage index, which is used to determine the base federal payment rate, a change in a single wage index could affect the payment rates applicable for each hospital discharge under PPS that year. Under these circumstances, retroactive corrections would cause a significant, if not debilitating, disruption to the Secretary's administration of the already-complex Medicare program.

*Id.* at 1233. Finally, the Court agreed with the Secretary's assertion that "a policy that denies retroactive corrections will encourage hospitals to submit carefully prepared data in the first instance because they know that a subsequent correction will have only prospective effect." *Id.*

Plaintiffs in this case rely on the D.C. Circuit's decision in *Georgetown University Hospital v. Bowen,* 862 F.2d 323 (D.C.Cir.1988) ("*Georgetown II*") to support their contention that the Secretary must make retroactive corrections to the PPS rate. However, the D.C. Circuit explained in *Methodist Hospital* why *Georgetown II* is inapplicable:

> Finally, notwithstanding the hospitals' suggestion, our conclusion that the statute's wage adjustment provision does not require retroactive corrections is not in conflict with the holding in *Georgetown II.* In that case, the court invalidated a policy that gave only prospective

effect to changes in "allowable costs" under the "hospital-specific" portion of the PPS transition rate. *See supra* note 3. Examining the statute's language and legislative history, the court identified a clear congressional intent to provide retroactive adjustments to "allowable costs" because the hospital-specific provision retained and incorporated the previous reasonable-cost regime into the PPS rate during the transition period. 862 F.2d at 326–27 & n. 9. Because *Georgetown II* focused only on the hospital-specific portion of the PPS transition rate, its reasoning does not extend to the instant appeal. Indeed, the *Georgetown II* court expressly recognized the distinction between the analysis of provisions under the hospital-specific component and those under PPS:

> [W]e note that when the PPS statute instructs the Secretary to determine "allowable operating costs per discharge" under the new prospective payment methodology, *see* 42 U.S.C. § 1395ww(d)(2)(A), it invokes an entirely different sense of the term: costs that are allowable under the new system may not be subject to subsequent retrospective revision, but that certainly does not mean that the same must be true when the statute refers to costs that were "allowable" under an entirely different payment methodology.

*Georgetown II,* 862 F.2d at 327 n. 11. Here, where the court must focus on procedures to implement the "entirely different payment methodology" of PPS, *id.,* the hospitals have pointed to no comparable intent on the part of Congress.

*Id.* at 1231–32. Since *Georgetown II* concerned the "hospital-specific portion" of Medicare reimbursement and this case, like *Methodist Hospital,* involves the fed-

eral rate, this Court finds Plaintiffs' reliance on *Georgetown II* to be unavailing.

Although Plaintiffs contend that *Methodist Hospital* is poorly reasoned and should not be followed, this Court finds the D.C. Circuit's reasoning to be persuasive and analogous to the case at bar. Although *Methodist Hospital* concerned an erroneous regional wage index while this case concerns an erroneous method of calculating medical malpractice insurance reimbursements, both wages and medical malpractice insurance costs are reimbursable under the PPS system, and data from both were used to calculate the federal rate. The rationales against retroactivity presented by the Secretary in *Methodist Hospital* are thus equally applicable in the case at bar.

It would be ironic if, as Plaintiffs contend, Congress's *Prospective* Payment System required the Secretary to adjust Medicare reimbursement rates retroactively. As the D.C. Circuit ultimately concluded, "the Secretary's prospective-only policy was a reasonable choice between the competing values of finality and accuracy." *Id.* at 1235 (citing *Chevron*, 467 U.S. at 865, 104 S.Ct. 2778 (concluding that an agency deserves deference where its policy "represents a reasonable accommodation of manifestly competing interests")). This Court is in agreement and holds that even if it was arbitrary and capricious for the Secretary to decline to adjust the PPS rate prospectively in 1986, it was not arbitrary and capricious for the Secretary to decline to adjust the PPS rate retroactively.

### C.

Finally, Plaintiffs contend that the Secretary's failure to adjust the PPS rate to account for the change in the malpractice rule is invalid because it was a substantive rule change effected without formal rulemaking. The Secretary responds that he did use the formal rulemaking procedure in deciding not to adjust the PPS rate. The Court agrees.

■ A substantive rule that has not been adopted in accordance with the procedural rulemaking requirements of the Administrative Procedure Act is invalid. *See Ohio Dep't of Human Servs. v. United States Dep't of Health & Human Servs., Health Care Fin. Admin.*, 862 F.2d 1228, 1237 (6th Cir.1988). These procedural requirements include affording notice of a proposed rulemaking and an opportunity for public comment prior to a rule's promulgation, amendment, modification, or repeal. *See* 5 U.S.C. § 553(b) (2000). Furthermore, the Medicare Act itself mandates that no rule or policy that "establishes or changes a substantive legal standard governing ... payment for services ... shall take effect unless it is promulgated by the Secretary by regulation...." 42 U.S.C. § 1395hh(a)(2).

The Secretary does not dispute that he was obligated to follow the procedural requirements of the Administrative Procedure Act when he declined to adjust the PPS rate. However, the Secretary did solicit comment on the question of whether the PPS rate should be adjusted to account for the replacement of the 1979 malpractice rule, and the Secretary published a proposed rule that indicated that no adjustment would be made. *See* 51 Fed.Reg. 19,970, 20,031 (June 3, 1986). After an opportunity for comment, the Secretary adopted a final rule that specifically addressed comments urging the adjustment of the PPS rate as a result of the change in the malpractice rules. *See* 51 Fed.Reg. 31,454, 31,526–27 (Sept. 3, 1986). The Secretary brought these entries in the Federal Register to the Court's attention in his brief, but Plaintiffs made no mention of them. Consequently, the Court finds that the Secretary followed the notice-and-comment procedures required by the Adminis-

trative Procedure Act when he decided not to adjust the PPS rate to account for the change in the malpractice rule.

## V.

Based on the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Docket Entry No. 11) will be DENIED, and Defendant's Motion for Summary Judgment (Docket Entry No. 13) will be GRANTED. Accordingly, this case will be DISMISSED.

An appropriate Order will be entered.